**FILED**

FEB 2 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZACHARY LOES,<br>6003 - 224th St. SW<br>Mountlake Terrace, WA  98043 | )<br>)<br>)<br>) |
| Plaintiff, | CASE NUMBER  1:07CV00400 |
| vs. | JUDGE: Paul L. Friedman |
| | DECK TYPE: Personal Injury/Malpractice |
| ASTRAZENECA<br>PHARMACEUTICALS LP,<br>ASTRAZENECA LP,<br>and ZENECA, INC.,<br>1800 Concord Pike<br>Wilmington, DE 19850 | DATE STAMP: 02/23/2007<br>)<br>)<br>)<br>) |
| JOHNSON & JOHNSON,<br>One Johnson & Johnson Plaza<br>New Brunswick, NJ 08933 | )<br>)<br>)<br>) |
| and | )<br>) |
| JANSSEN, L.P., f/k/a/ JANSSEN<br>PHARMACEUTICA PRODUCTS, L.P.,<br>Titusville, NJ 08560 | )<br>)<br>)<br>) |
| Defendants. | ) |

## COMPLAINT

COMES NOW the Plaintiff Zachary Loes, by counsel, and for his Complaint against Defendants AstraZeneca Pharmaceuticals LP, AstraZeneca LP, Zeneca, Inc., (referred to collectively as "AstraZeneca"),  and Johnson & Johnson and Janssen, L.P., f/k/a Janssen Pharmacuetica Products, L.P., (referred to collectively as "Janssen"), jointly and severally, alleges as follows:

1.     This is an action by Plaintiff seeking damages for personal injuries and damages suffered as a result of the defective and dangerous pharmaceutical products, Seroquel (quetiapine), which was manufactured, marketed, distributed and/or sold by Defendant AstraZeneca and Risperdal (risperidone) which was manufactured, marketed, distributed and/or sold by Defendant Janssen.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between Plaintiff and all Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

3.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a)(2) and (3) and (c), in that a substantial part of the events or omissions giving rise to the following claims occurred in this judicial district and/or one or more of the defendants is a corporation and is subject to personal jurisdiction in this district.

## PARTIES

4.     Plaintiff, Zachary Loes is a citizen of the State of Washington.

5.     Defendant AstraZeneca Pharmaceuticals LP is a foreign (Delaware) limited partnership, which does business in the District of Columbia and throughout the United States by manufacturing, distributing, marketing, selling and/or profiting from Seroquel in the District of Columbia and throughout the United States. AstraZeneca Pharmaceuticals LP, is the U.S. Subsidiary of AstraZeneca PLC, and was created as a result of the union of Zeneca Pharmaceuticals and Astra Pharmaceuticals LP in the U.S. after the 1999 merger. AstraZeneca Pharmaceuticals LP's principal place of business is

in Delaware.

6.     At all times material hereto, AstraZeneca PLC and AstraZeneca Pharmaceuticals LP (a wholly owned subsidiary of AstraZeneca PLC) (collectively referred to as "AstraZeneca") have shared many of the same officers and directors and have had a unity of interest in ownership sufficient to make them indistinguishable.

7.     Defendant AstraZeneca LP is a foreign (Delaware) limited partnership, which does business in the District of Columbia and throughout the United States by distributing, marketing, selling and/or profiting from Seroquel in the District of Columbia and throughout the United States.

8.     Defendant Zeneca, Inc., is a foreign (Delaware) corporation, which does business in the District of Columbia and throughout the United States by distributing, marketing, selling and/or profiting from Seroquel in the District of Columbia and throughout the United States.

9.     Defendant Johnson & Johnson is a foreign corporation organized and doing business under the laws of the State of New Jersey, and, at all times herein mentioned, was doing business in the District of Columbia and throughout the United States.

10.     Defendant Janssen, L.P., f/ka/ Janssen Pharmaceutica Products, L.P., is a foreign corporation organized and doing business under the laws of the State of New Jersey and, at all times herein mentioned, was doing business in the District of Columbia and throughout the United States.

## FACTUAL BACKGROUND -- SEROQUEL

3

11.    In June 1997, the Food and Drug Administration ("FDA") approved the newest "atypical anti-psychotic", Seroquel (quetiapine fumarate), for use in the United States.

12.    The prescription drug "Seroquel" (quetiapine fumarate) is an "anti-psychotic" medication, belonging to a class of drugs referred to as "atypical anti-psychotics." (Other atypicals include Zyprexa (Eli Lilly), Risperdal (Janssen), and Clozaril (Novartis), which have been in use in the United States since the early to mid 1990's.

13.    Seroquel is a medication commonly prescribed to patients to aid in the treatment of mental disorders including schizophrenia. The pharmacologic action of Seroquel is thought to be dependent on its ability to block or moderate the level of dopamine; a chemical found in the brain that in excessive amounts is believed to cause abnormal thinking and hallucinations. It appears to work primarily by blocking neurotransmitter sites of serotonin and dopamine, as well as muscarinic and alpha-adrenergic, and histamine receptors.

14.    AstraZeneca obtained, licensed, manufactured, promoted, marketed, developed and placed in the stream of commerce the pharmaceutical "quetiapine fumarate" which was sold in the United States under the trade name "Seroquel."

15.    From at least 1997 through today, the Defendant manufactured, labeled, packaged, distributed, supplied, marketed, advertised, dispensed and sold, and by said activities, caused Seroquel to be placed into the stream of commerce throughout the United States, and to ultimately reach the Plaintiff for consumption.

4

16.    At all times material hereto, AstraZeneca manufactured, created, designed, tested, labeled, sterilized, packaged, distributed, supplied, marketed, sold, advertised, and/or otherwise caused the product Seroquel to be placed into the stream of commerce, and ultimately to be ingested by the Plaintiff.

17.    The product warnings for Seroquel in effect during the relevant time period were vague, incomplete or otherwise wholly inadequate, both substantively and graphically, to alert prescribing physicians as well as consumer patients to the actual risks associated with this drug.

18.    The use of Seroquel has been known to cause serious and sometimes fatal injuries to the liver, kidneys, and pancreas. Its adverse effects include, but are not limited to, ketoacidosis, pancreatitis, and diabetes mellitus, and other serious health problems associated with diabetes including heart disease, blindness, coma, seizures, and death. In addition to an increased risk of developing diabetes mellitus, and the serious complications streaming therefrom, including seizures, coma, death, liver disease, kidney disease, blindness, other serious side effects including rapid weight gain, pancreatitis, increased thirst, urinary frequency and hyperglycemia have been attributed to Seroquel.

19.    The reported risk associated with Seroquel and the onset of diabetes is nearly 3.34 times higher than older drugs used to treat schizophrenia, such as Haldol. According to these reports, compared to other drugs in its class, Zyprexa, (Eli Lilly & Co.) – 1.27 times more likely, and Risperdal (Johnson & Johnson) – 1.49 times more likely, Seroquel has a much greater increased association with the onset of diabetes mellitus than any other anti-psychotic on the market.

20.     Seroquel was advertised, promoted, and marketed heavily by AstraZeneca as a safe and effective treatment initially for the treatment of schizophrenia, and later for the treatment of mania associated with Bipolar I, promising fewer side effects than other similar treatments including the other atypical antipsychotics on the market.

21.     AstraZeneca, through its marketing department, its sales managers, and field sales force promoted the drug for uses beyond its approved indications, offering incentives to doctors to increase prescriptions. Through these marketing efforts, AstraZeneca was able to capture a larger market share in the anti-psychotic market.

22.     The marketing and promotion efforts of AstraZeneca, its advertisers, and sales force served to overstate the benefits of Seroquel, and minimize and downplay the risks associated with the drug. These promotional efforts were made, while fraudulently withholding important safety information from the physicians, the FDA, and the public, specifically that AstraZeneca was aware of numerous reports of diabetes associated with the use of Seroquel, well beyond the background rate, and well beyond the rate for other anti-psychotic agents.

23.     On August 22, 2003, new reports were issued which confirmed previous studies describing a link between the class of atypical antipsychotics and diabetes. These new reports, described an increased incidence of diabetes in patients receiving Seroquel, than in patients receiving older anti-psychotics, or even other atypicals, including Zyprexa, Clozaril, and Risperdal.

24.     Clozaril (clozapine) was the first atypical introduced in the early 1990's. Risperdal, (risperidone), was approved for use in the United States in 1994. In September

6

1996 the Food and Drug Administration (FDA) approved another new atypical antipsychotic, Zyprexa (olanzapine), for use in schizophrenia, and Seroquel (quetiapine) was approved in September 1997.

25.    The Japanese label for Seroquel provides a detailed warning regarding the risks of diabetes associated with Seroquel, and specifically informs physicians regarding the necessity of medical monitoring of patients on Seroquel. At the time the Plaintiff ingested Seroquel, the Defendant had not adopted this safer; more accurate, label for the U.S. distribution of Seroquel.

26.    The Japanese label warns specifically of the diabetes risk, prominently in the beginning of the package label stating:

   a.    Quetiapine is contraindicated for use in patients with diabetes or a history of diabetes;

   b.    Quetiapine should be used with caution in patients with risk factors for diabetes, including hyperglycemia, obesity or a family history of diabetes;

   c.    Patients receiving quetiapine should be carefully monitored for symptoms of hyperglycemia and the drug should be discontinued if such symptoms occur. The symptoms of severe hyperglycemia include weakness, excessive eating, excessive thirst, and excessive urination; and,

   d.    Physicians should educate patients and their family members about the risk of serious hyperglycemia associated with the quetiapine and how to identify the symptoms of hyperglycemia.

26.    In regulatory action overseas, the Ministry of Health, Labor, and Welfare in Japan has ordered a Dear Doctor warning for AstraZeneca's quetiapine (Seroquel) after the ministry received 13 reports of serious side effects, including one death, since the

drug's launch in that country in February 2001. Case reports involved elevated levels of blood glucose, diabetic ketoacidosis, and coma.

27.     While warning of the association of Seroquel with diabetes, increased glucose tolerance, ketoacidosis, weight gain, and the need for medical monitoring in Japan, AstraZeneca has left the US public and physicians in the dark.

## RISPERDAL

28.     From on or about 1994 through today, Defendant Janssen manufactured, created, designed, tested, labeled, sterilized, packaged, licensed, distributed, supplied, marketed, sold, and advertised and placed into the stream of commerce the pharmaceutical drug product "risperidone" which was sold in the United States under the trade name "Risperdal."

29.     The prescription drug Risperdal is an "anti-psychotic" medication belonging to a class of drugs referred to as "atypical" or "second-generation" anti-psychotics.  This class of drugs, including Risperdal, causes an increased risk of rapid weight gain, hyperlipidemia, hypercholesteremia, hyperglycemia, diabetes mellitus, ketoacidosis, seizures, hyperosmolar coma, death, pancreatitis, liver disease, blindness, and other serious health problems associated with diabetes, including heart disease, kidney disease, diabetic neuropathy, digestive problems, bladder problems, loss of vision, damage to blood vessels, high cholesterol, difficulty in healing sores, amputation of feet and limbs, stroke, and death.

30.     Risperdal is commonly prescribed to patients to aid in the treatment of schizophrenia and manic episodes associated with bipolar I disorder.  The pharmacologic

8

action of these drugs is unknown but is thought to be dependent on their ability to block or moderate the level of dopamine and/or serotonin; chemicals found in the brain that in excessive amounts may possibly cause abnormal thinking and hallucinations.

31.    The anti-psychotic drug market is $12 Billion worldwide.  Defendant Janssen viewed Risperdal as a blockbuster product with significant projected growth potential.  In 2002, Risperdal reached over $2 Billion in annual sales, and in 2005, Risperdal reached $3.5 Billion in annual sales.

32.    Risperdal was marketed by Defendant Janssen as safe and effective for the treatment of schizophrenia, initially, and, later, for bipolar mania, promising greater effectiveness and fewer side effects than with other available antipsychotics.

33.    The risk associated with this class of drugs, including Risperdal, and the onset of diabetes is higher than for older, less expensive drugs used to treat schizophrenia.

34.    The product warnings in effect for Risperdal prior to and during the time period that Plaintiff was taking this drug product were vague, incomplete or otherwise wholly inadequate, both substantively and graphically, to alert prescribing physicians, as well as consumer patients, to the actual risks associated with this drug.

35.    Despite the fact that Defendant Janssen knew or should have known that Risperdal was associated with hyperglycemia and diabetes mellitus and related conditions, said Defendant recklessly, negligently, and with willful and wanton indifference to the health and safety of consumers, including Plaintiff, failed to include any warning regarding hyperglycemia, diabetes mellitus, or related conditions until on or

after December 2003. Prior to that time, the label was defective in that it failed to advise prescribing doctors or the public, including Plaintiff, of the need to conduct fasting blood sugar tests before and during treatment and that treatment should be stopped if symptoms of hyperglycemia or diabetes mellitus appeared. In fact, the label is still defective in that it does not contain a black box warning for diabetes mellitus or hyperglycemia and only recommends blood glucose testing for patients with "risk factors" and those who develop "symptoms" of hyperglycemia.

36.    The marketing and promotion efforts of Defendant Janssen, through its advertisers and sales force, overstated the benefits of Risperdal and minimized and downplayed the risks associated with this drug. These promotional efforts were made, while fraudulently, willfully and wantonly withholding important safety information from the physicians, the FDA, and the public, specifically that Defendant Janssen was aware of numerous reports of diabetes associated with the use of these drugs, well beyond the background rate and well beyond the rate for other anti-psychotic agents.

37.    Prior to the time of ingestion of Risperdal by Plaintiff, Defendant Janssen knew or, in the exercise of reasonable care, should have known of, the existence of studies published in the medical literature associating Risperdal with weight gain, diabetes, pancreatitis, and other serious side effects.

38.    After Risperdal was introduced to the U.S. market, studies conducted in Europe and Japan revealed that numerous patients treated with atypical antipsychotics, including Risperdal, experienced a significantly higher incidence of severe and permanent diseases and conditions, including diabetes and hyperglycemia.

39.     Shortly after Defendant Janssen began selling Risperdal, reports of consumers who were using Risperdal suffering from hyperglycemia, acute weight gain, diabetes mellitus, pancreatitis, and other severe diseases and conditions associated began to surface. Defendant Janssen knew, or was reckless in not knowing, of these reports. Furthermore, Defendant Janssen was aware of studies and journal articles linking use of Risperdal with these and other severe and permanent hyperglycemia-related adverse events and diseases prior to and during the time that Plaintiff ingested Risperdal.

40.     In December 2000, an article published in the *British Medical Journal* found no clear evidence that Risperdal or other atypical anti-psychotics like Seroquel and Risperdal were more effective or better tolerated than conventional anti-psychotics including Haldol and Thorazine.

41.     In November 2003, an article published in the *Journal of the American Medical Association* compared Zyprexa with a typical antipsychotic and found "no statistically or significant advantages" of Risperdal for treatment of schizophrenia. The authors did note a significant difference among the costs of typical antipsychotics and Zyprexa per tablet: $0.02 versus $4.84 respectively.

42.     Recently researchers at the National Institute of Mental Health published a report on atypical antipsychotics, including Risperdal, which found that the majority of patients in each group discontinued their assigned treatment owing to inefficacy or intolerable side effects or for other reasons and that the atypicals, including Risperdal, were no more effective than the older, cheaper, and still available conventional antipsychotic perphenazine.

43.    Upon information and belief, prior to and during the time Plaintiff ingested Risperdal, the Japanese label for Risperdal provided a detailed warning regarding the risks of diabetes associated with Risperdal, and specifically informed physicians regarding the necessity of medical monitoring of patients on Risperdal. At the time the Plaintiff ingested Risperdal, Defendant Janssen had not adopted this safer, more accurate label for the U.S. distribution of Risperdal.

44.    Japanese researchers reported that severe weight gain can be a serious side effect of combination therapy involving atypical antipsychotics and certain SSRIs. In particular, in a retrospective chart review, they identified the combination of risperidone and paroxetine as associated with severe weight gain—as much as 14 kg over four months in one patient—that also resulted in diabetic complications.

45.    Upon information and belief, prior to and during the time of use of Risperdal by Plaintiff, the Japanese label warned specifically of the diabetes risk, prominently in the beginning of the package label stating:

    a.    Risperidone is contradicted for use in patients with diabetes or a history of diabetes.

    b.    Risperidone should be used with caution in patients with risk factors for diabetes, including hyperglycemia, obesity or a family history of diabetes.

    c.    Patients receiving risperidone should be carefully monitored for symptoms of hyperglycemia, and the drug should be discontinued

if such symptoms occur. The symptoms of severe hyperglycemia include weakness, excessive eating, excessive thirst, and excessive urination.

d. Physicians should educate patients and their family members about the risk of serious hyperglycemia associated with risperidone and how to identify the symptoms of hyperglycemia.

46. In April 2002, the Japanese Health & Welfare Ministry issued emergency safety information regarding the risk of diabetes, diabetes ketoacidosis, and hyperosmolar coma for patients prescribed Risperdal. On information and belief, prior to that time, Defendant Janssen was involved in discussions with the Japanese agency regarding labeling changes for Risperdal and other atypicals.

47. While warning of the association of Risperdal with diabetes, glucose dysregulation, ketoacidosis, weight gain and the need for medical monitoring in Japan, Defendant Janssen failed to provide the same or similar warnings to the public and prescribing physicians in the United States.

48. Plaintiff was prescribed, purchased and ingested Seroquel and Risperdal. As a direct and proximate result of using either or both of these drug products, Plaintiff sufferer diabetes mellitus, diabetic ketoacidosis, pancreatitis, and other injuries.

**COUNT I**

**(NEGLIGENCE)**

**(ASTRAZENECA)**

49.    The allegations previously set forth in paragraphs 1 through 27 and paragraph 48 are realleged and reincorporated and incorporated by reference within this count.

50.    .Defendant AstraZeneca had a duty to exercise reasonable care in the design, manufacturing, testing, advertising, marketing, promotion, labeling, warnings given, and sale of the prescription drug product Seroquel.

51.    Defendant AstraZeneca was negligent in that, among other things, Defendant AstraZeneca:

> a.    Failed to accompany the product with adequate warnings regarding the serious adverse side effects, including diabetes mellitus, ketoacidosis, hyperosmolar coma, death, hyperglycemia, weight gain, glucose dysregulation, hyperlipidemia, hypertriglyceridemia, neuroleptic malignant syndrome and tardive dyskinesia associated with the use of Seroquel;
>
> b.    Failed to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Seroquel;
>
> c.    Failed to provide adequate training and instruction to medical care providers for appropriate use of Seroquel;
>
> d.    Failed to adequately warn Plaintiff prior to actively encouraging the sale of Seroquel, either directly or indirectly (through the prescribing physician), orally or in writing, about the following:

    i.      The need to take a complete medical history of the patient prior to ingesting Seroquel;

    ii.     the need for a battery of diagnostic tests to be performed on the patient prior to ingesting Seroquel to discover risk factors and help prevent potentially fatal side effects; and

    iii.    the need for comprehensive, regular medical monitoring to ensure early discovery of hyperglycemia, diabetes, weight gain, hyperlipidemia, hypertriglyceridemia, pancreatitis, and other potentially fatal side effects;

e.    Failed to adequately warn that the risks associated with the ingestion of Seroquel exceeded the risks of other comparable forms of medication for schizophrenia or bipolar mania;

f.    Failed to adequately warn about the increased danger and potentially fatal relationship in combining use of Seroquel with various other drugs or use with certain identifiable disorders;

g.    Exaggerated the benefits and downplayed the risks of Seroquel in a deceptive manner and in a manner lacking fair balance;

h.    Recklessly, falsely, and deceptively represented or knowingly omitted, suppressed, or concealed material facts regarding the safety and efficacy of Seroquel from prescribing physicians and the consuming public, and, had prescribing physicians and the

consuming public known of such facts, the drugs would never have been prescribed to, or used by, Plaintiff;

i.    Remained silent despite their knowledge of the growing acceptance by the public and physicians of misinformation and misrepresentations regarding both the safety and efficacy of atypical antipsychotics in general and Seroquel in particular, and did so because the prospect of huge profits outweighed health and safety issues, all to the injury and detriment of Plaintiff;

j.    Failed to perform their post-manufacturing and continuing duty to warn which arose when they knew, or with reasonable certainty should have known, that Seroquel was being prescribed in a fatal or injurious combination or manner of for uses for which there were no adequate studies as to safety and efficacy and for which the drug product was not approved;

k.    Despite the fact that Defendant AstraZeneca received numerous reports of rapid weight gain, hyperglycemia, diabetes, ketoacidosis, hyperosmolar coma, death, neuroleptic malignant syndrome, tardive dyskinesia, and other serious adverse events, for Seroquel and other atypical antipsychotic drugs of this class via the spontaneous reporting system and the medical literature prior to and during the time that Plaintiff was ingesting Seroquel, such that Defendant AstraZeneca knew or should have known that a

reasonable association existed between Seroquel and said serious adverse events, nonetheless, Defendant AstraZeneca continued to market Seroquel to physicians and consumers, including Plaintiff, without disclosing these adverse events and despite the fact that there were safer alternative methods of treating schizophrenia and bipolar mania;

l.    Defendant AstraZeneca, through its marketing department, sales managers, and field sales force, promoted Seroquel for uses beyond its approved indications, offering incentives to doctors to increase prescriptions in order to capture a larger share of the anti-psychotic market.

m.    Failed to use reasonable care in the selection, hiring, training and supervision of its employees and agents engaged in marketing, promotion, distribution, and sale of Seroquel;

n.    Violated the laws and regulations regarding the labeling, distribution, sale, marketing, and promotion of Seroquel; and

o.    Was otherwise careless, negligent, grossly negligent, reckless, and acted with willful and wanton disregard for the rights of Plaintiff.

52.    Defendant AstraZeneca knew or should have known that physicians and patients, such as Plaintiff, would rely on the labeling for Seroquel and would foreseeably suffer injury as a result of Defendant AstraZeneca's failure to exercise ordinary care as described above.

53.    The aforesaid negligent acts by Defendant AstraZeneca fell below the standard of care of a reasonably prudent pharmaceutical drug manufacturer or distributor.

54.    As a direct and proximate result of said acts by Defendant AstraZeneca, Plaintiff has suffered, and will continue to suffer in the future, injuries and damages as described below:

a.  serious permanent physical injuries, including diabetes mellitus, diabetic ketoacidosis, pancreatitis;

b.  pain and mental anguish;

c.  loss of enjoyment of life;

d.  complications of diabetes such as heart disease, kidney disease, diabetic neuropathy, digestive problems, bladder problems, loss of vision, damage to blood vessels, high cholesterol, difficulty in healing sores, amputation of feet and limbs, stroke, and death;

e.  medical attention and care and medical expenses;

f.  loss of earnings and/or earning capacity;

g.  need for assistance with the activities of daily living, and other financial expenses; and

h.  embarrassment and inconvenience.

55.    Defendant AstraZeneca's conduct was willful, wanton, and done with intentional or reckless indifference to the rights of Plaintiff and to the public health and safety and the health and safety of Plaintiff and other consumers so as to entitle Plaintiff to an award of punitive damages against Defendant AstraZeneca.

18

## COUNT II

## (FRAUD)

## (ASTRAZENECA)

56.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

57.     Defendant AstraZeneca knew or should have known that Seroquel was dangerous and not as effective for its purpose as represented, and posed greater risks than disclosed, and was otherwise not as represented, as previously alleged.

58.     Despite the fact that Defendant AstraZeneca was under a duty to disclose this information to Plaintiff's physician and to Plaintiff, Defendant AstraZeneca knowingly, and with intent to deceive and defraud consumers, including Plaintiff, made misrepresentations and partial disclosures concerning the nature and quality of Seroquel which Defendant AstraZeneca had a duty to correct because Defendant AstraZeneca was in a superior position to know the true state of the facts about the dangerous and defective nature of Seroquel and its known risks to physicians and Plaintiff.  These deliberate and/or intentional misrepresentations and omissions of material facts include but are not limited to:

> i.   Stating orally, in product labeling, and in marketing and promotional materials that Seroquel was safe and effective for the treatment of schizophrenia and bipolar mania, which was false and not supported by adequate studies;

j.  Stating orally, in product labeling, and in marketing and promotional materials that Seroquel was safer and more effective for the treatment of schizophrenia and bipolar mania than other available drug products which were less expensive, which was false and not supported by adequate studies;

k.  Advising physicians through sales and marketing personnel that Seroquel was safe and effective for the treatment of conditions and symptoms for which it was not approved and for which there were not adequate studies of safety and efficacy;

l.  Suppressing, failing to disclose and mischaracterizing the known risks of rapid weight gain, hyperglycemia, hyperlipidemia, diabetes mellitus, diabetic ketoacidosis, hyperosmolar coma, death, neuroleptic malignant syndrome, and tardive dyskinesia due to ingestion of Seroquel, which were known to Defendant AstraZeneca through spontaneous reports and studies published in the medical literature;

m.  Concealing the fact that Seroquel was required by the responsible Japanese regulatory agency to carry a warning of the risk of hyperglycemia and diabetes and that patients should be monitored for these conditions and the drug stopped if signs or symptoms appeared;

n.  Omitting material information showing that Seroquel was no more effective than other anti-psychotic drugs already available on the market;

o.  Failing to timely and fully disclose the complete and actual results of all clinical tests and studies related to Seroquel;

p.  Failing to disclose that adequate and/or standard and/or generally accepted standards for pre-clinical and clinical testing had not been done;

q.  Downplaying or even denying to practitioners, both orally and in written promotional materials, that Seroquel and other drugs in this class can and do cause rapid weight gain, hyperglycemia, hyperlipidemia, diabetes mellitus, diabetic ketoacidosis, and complications and death therefrom, contrary to information placed in the product labeling at the direction of the FDA;

r.  Failing to advise prescribers and consumers of the need to take a complete medical history prior to prescribing or using Seroquel and to monitor patients for blood sugar levels from labeling and promotional materials;

s.  Failing to disclose that clinical pre-marketing studies for Seroquel were conducted  with limited numbers of patients, in limited populations, for short periods of use of only a few weeks, or with lower doses of Seroquel, and  that Seroquel had not been adequately tested for safety and efficacy in children, the elderly, patients with pre-existing medical conditions, or in conjunction with other medications; and then encouraging use for patients in those populations or, knowing

that the drugs were being used in that way, failing to warn practitioners of the risks of doing so;

t. Failing to disclose that the drop-out rate with patients on Seroquel was among the highest of any antipsychotic medication, an indication of lack of effectiveness or intolerability or both;

u. Failing to disclose that adequate and/or standard and/or generally accepted standards for post-marketing testing had not been done;

v. Making these misrepresentations concerning the safety, efficacy and benefits of Seroquel as detailed in this Complaint without full and adequate disclosure of the underlying facts which rendered such statements false and misleading; and

w. Failing to include the aforesaid information in "Dear Doctor" or "Dear Healthcare Provider" letters and other correspondence with practitioners;

x. Failing to include the aforesaid information in marketing and promotional materials given or shown to practitioners; and

y. Failing to include the aforesaid information in the product labeling or package inserts.

59.     Neither Plaintiff nor her doctors knew or could have learned the material facts and important information Defendant AstraZeneca omitted and suppressed.  The facts and information suppressed and concealed by Defendant AstraZeneca were material, and of such a nature that the suppression and concealment of such facts caused,

contributed to, and/or was a substantial factor in the decision of Plaintiff's physician to prescribe, and of Plaintiff to take, Seroquel.

60.    Defendant AstraZeneca knew or should have known that Plaintiff's physician and Plaintiff were relying on Defendant's fraudulent misrepresentations and omissions of material facts.

61.    As a direct and proximate result of Defendant AstraZeneca's' fraud, suppression, and omission of material facts, Plaintiff acted to Plaintiff's detriment in purchasing and ingesting Seroquel, which Plaintiff would not have purchased or ingested had Plaintiff been told the truth, and should be reimbursed what Plaintiff spent.

62.    As a direct and proximate result of said acts by Defendant AstraZeneca, Plaintiff has suffered injuries and damages as described herein.

## COUNT III

## STRICT PRODUCT LIABILITY (FAILURE TO WARN)

## (ASTRAZENECA)

63.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

64.    The Seroquel manufactured and/or supplied by Defendant AstraZeneca was and is unaccompanied by proper warnings regarding all known adverse side effects and the comparative severity and duration of such adverse effects. The warnings given did not and do not accurately reflect the severity or duration of the adverse side effects or the true potential and/or likelihood or rate of the side effects.

65.     Defendant AstraZeneca failed to perform adequate testing which would have shown that Seroquel possessed serious potential side effects with respect to which full and proper warnings accurately and fully reflecting symptoms, scope and severity should have been made with respect to the use of the drugs. Had the testing been adequately performed, Seroquel would have been allowed to enter the market, if at all, only with warnings that would have clearly and completely identified the risks and dangers of the drugs.

66.     As a direct and proximate result of the failure of Defendant AstraZeneca to conduct adequate testing and to furnish an adequate warning to physicians and consumers including Plaintiff and Plaintiff's doctors, the Seroquel manufactured and/or distributed and/or supplied by Defendant AstraZeneca, at the time it left Defendant AstraZeneca's hands, was unreasonably dangerous and defective.

67.     Despite this defect, Defendant AstraZeneca continued to aggressively promote Seroquel to physicians, including Plaintiff's physician and to consumers, including Plaintiff.

68.     As a direct and proximate result of the defective condition of Seroquel, as manufactured and/or supplied and/or distributed by Defendant AstraZeneca, Plaintiff has suffered injuries and damages as described herein.

**COUNT IV**

**STRICT PRODUCT LIABILITY**

**(RESTATEMENT SECOND OF TORTS §402A (1965))**

**(ASTRAZENECA)**

69.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

70.    The Seroquel manufactured and/or distributed and/or supplied by Defendant AstraZeneca was not altered prior to use and was defective in design or formulation in that when it left the hands of Defendant AstraZeneca, the foreseeable risks exceeded the benefits associated with the design or formulation.

71.    Alternatively, the Seroquel manufactured, distributed and/or supplied by Defendant AstraZeneca was defective in design or formulation in that when said drug product left the hands of said Defendant, it was unreasonably dangerous, was more dangerous than an ordinary consumer would expect, and was more dangerous than other anti-psychotic drugs available at that time.

72.    There existed, at all times material hereto, safer alternative medications.

73.    As a direct and proximate result of the defective condition of Seroquel, Plaintiff has suffered injuries and damages as described herein.

### COUNT V

### BREACH OF EXPRESS WARRANTY

### (ASTRAZENECA)

74.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

75.    Defendant AstraZeneca expressly warranted in the product labeling and, on information and belief, in promotional materials that Seroquel was safe and effective

for the treatment of schizophrenia and bipolar mania, based on adequate clinical studies and that it was "well-tolerated."

76.     Defendant AstraZeneca failed to conform to these express representations because Seroquel is not safe or effective and possesses a high risk of serious, life-threatening side effects, including those suffered by Plaintiff.

77.     Plaintiff has given reasonable notice to Defendant AstraZeneca of its breach of express and implied warranties.

78.     As a direct and proximate result of said breach of warranty, Plaintiff has suffered injuries and damages as described herein.

## COUNT VI

## BREACH OF IMPLIED WARRANTY

## (ASTRAZENECA)

79.     Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

80.     At the time Defendant AstraZeneca marketed, sold and distributed Seroquel for use by Plaintiff and other consumers, said Defendant knew of the use for which Seroquel was intended and impliedly warranted Seroquel to be of merchantable quality and safe and fit for such use.

81.     Plaintiff and her physician reasonably relied upon the skill and judgment of Defendant AstraZeneca as to whether Seroquel was of merchantable quality and safe and fit for its intended use.

82.    Contrary to such implied warranties, Seroquel was not of merchantable quality or safe or fit for its intended use because Seroquel was and is unreasonably dangerous and unfit for the ordinary or particular purposes for which it was used as described above.

83.    Plaintiff has given reasonable notice to Defendant AstraZeneca of its breach of express and implied warranties.

84.    As a direct and proximate result of said breach of warranty, Plaintiff has suffered injuries and damages as described herein.

## COUNT VII

## CONCEALMENT, SUPPRESSION, OR OMISSION OF MATERIAL

## FACTS

### (ASTRAZENECA)

85.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

86.    Defendant AstraZeneca had a post-manufacturing and continuing duty to warn, which arose when they knew, or with reasonable care should have known, that adverse events associated with Seroquel were serious and sometimes fatal.

87.    Defendant AstraZeneca knew or should have known (or would have known had appropriate testing and/or safety monitoring been done) that use of Seroquel caused serious and potentially life-threatening side effects of diabetes.

88.    Defendant AstraZeneca omitted, suppressed, or concealed material facts concerning the dangers and risks associated with the use of Seroquel, including but not

limited to the risks of diabetes mellitus and other injuries. Further, said Defendant purposely downplayed and understated the serious nature of the risks associated with Seroquel use in order to increase the sales of the drug product.

89.     Defendant AstraZeneca falsely and deceptively misrepresented or knowingly omitted, suppressed, or concealed facts of such materiality that Seroquel would never have been approved, no reasonable physician would have prescribed Seroquel to Plaintiff, and Plaintiff would not have ingested Seroquel if they had known about the concealed facts.

90.     Defendant AstraZeneca engaged in calculated silence, despite their knowledge of the growing public acceptance of misinformation and misrepresentations regarding both the safety and efficacy of the use of Seroquel, and did so because the prospect of significant future profits caused them to ignore concerns regarding health and safety issues, all to the significant detriment of the public, including the Plaintiff.

91.     Safer and less expensive anti-psychotics were available to patients being treated with Seroquel.

92.     Defendant AstraZeneca's actions, as set forth herein, constitute knowing omission, suppression or concealment of material facts, made with the knowledge and intent that doctors and their patients, including Plaintiff, would rely upon such concealment, suppression or omission in connection with the prescribing and use of Seroquel.

93.    In fact, Plaintiff, directly and/or through Plaintiff's prescribing physician, was induced by the Defendant AstraZeneca's omission, suppression and concealment to use Seroquel.

94.    As a direct and proximate result of the conduct of Defendant AstraZeneca as described herein, the Plaintiff has suffered injuries and damages as described herein.

## COUNT VIII

## NEGLIGENCE

## (JANSSEN)

95.    The allegations previously set forth in paragraphs 29 through 50 are realleged and reincorporated and incorporated by reference within this count.

96.    .Defendant Janssen had a duty to exercise reasonable care in the design, manufacturing, testing, advertising, marketing, promotion, labeling, warnings given, and sale of the prescription drug product Risperdal

97.    Defendant Janssen was negligent in that, among other things, Defendant Jansen:

    a.    Failed to accompany the product with adequate warnings regarding the serious adverse side effects, including diabetes mellitus, ketoacidosis, hyperosmolar coma, death, hyperglycemia, weight gain, glucose dysregulation, hyperlipidemia, hypertriglyceridemia, neuroleptic malignant syndrome, and tardive dyskinesia associated with the use of Risperdal;

b.   Failed to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Risperdal;

c.   Failed to provide adequate training and instruction to medical care providers for appropriate use of Risperdal;

d.   Failed to adequately warn Plaintiff prior to actively encouraging the sale of Risperdal, either directly or indirectly (through the prescribing physician), orally or in writing, about the following:

   i.    the need to take a complete medical history of the patient prior to ingesting Risperdal;

   ii.   the need for a battery of diagnostic tests to be performed on the patient prior to ingesting Risperdal to discover risk factors and help prevent potentially fatal side effects; and

   iii.  the need for comprehensive, regular medical monitoring to ensure early discovery of hyperglycemia, diabetes, weight gain, hyperlipidemia, hypertriglyceridemia, pancreatitis, and potentially fatal side effects;

e.   Failed to adequately warn that the risks associated with the ingestion of Risperdal exceeded the risks of other comparable forms of medication for schizophrenia or bipolar mania;

f.   Failed to adequately warn about the increased danger and potentially fatal relationship in combining use of Risperdal with various other drugs or use with certain identifiable disorders;

g.    Exaggerated the benefits and downplayed the risks of Risperdal in a deceptive manner and in a manner lacking fair balance;

h.    Recklessly, falsely, and deceptively represented or knowingly omitted, suppressed, or concealed material facts regarding the safety and efficacy of Risperdal from prescribing physicians and the consuming public, and had prescribing physicians and the consuming public known of such facts, the drugs would never have been prescribed to, or used by, Plaintiff;

i.    Remained silent despite their knowledge of the growing acceptance by the public and physicians of misinformation and misrepresentations regarding both the safety and efficacy of atypical antipsychotics in general and Risperdal in particular, and did so because the prospect of huge profits outweighed health and safety issues, all to the injury and detriment of Plaintiff;

j.    Failed to perform their post-manufacturing and continuing duty to warn which arose when they knew, or with reasonable certainty should have known, that Risperdal was being prescribed in a fatal or injurious combination or manner of for uses for which there were no adequate studies as to safety and efficacy and for which the drug product was not approved;

k.    Despite the fact that Defendant Janssen received numerous reports of rapid weight gain, hyperglycemia, diabetes, ketoacidosis,

hyperosmolar coma, death, neuroleptic malignant syndrome, tardive dyskinesia, and other serious adverse events, for Risperdal and other atypical antipsychotic drugs of this class via the spontaneous reporting system and the medical literature prior to and during the time that Plaintiff was ingesting Risperdal, such that Defendant Janssen knew or should have known that a reasonable association existed between Risperdal and said serious adverse events, nonetheless, Defendant Janssen continued to market Risperdal to physicians and consumers, including Plaintiff, without disclosing these adverse events and despite the fact that there were safer alternative methods of treating schizophrenia and bipolar mania;

l.      Defendant Janssen, through its marketing department, sales managers, and field sales force, promoted Risperdal for uses beyond its approved indications, offering incentives to doctors to increase prescriptions in order to capture a larger share of the anti-psychotic market;

m.      Failed to use reasonable care in the selection, hiring, training and supervision of its employees and agents engaged in marketing, promotion, distribution, and sale of Risperdal;

n.      Violated the laws and regulations regarding the labeling, distribution, sale, marketing, and promotion of Risperdal; and

o.   Was otherwise careless, negligent, grossly negligent, reckless, and acted with willful and wanton disregard for the rights of Plaintiff.

98.   Defendant Janssen knew or should have known that physicians and patients, such as Plaintiff, would rely on the labeling for Risperdal and would foreseeably suffer injury as a result of Defendant Janssen's failure to exercise ordinary care as described above.

99.   The aforesaid negligent acts by Defendant Janssen fell below the standard of care of a reasonably prudent pharmaceutical drug manufacturer or distributor.

100.   As a direct and proximate result of said acts by Defendant Janssen, Plaintiff has suffered injuries and damages as described below.

101.   Plaintiff suffered and will continue to suffer in the future from:

z.   serious permanent physical injuries, including diabetes mellitus, liver disease, and high cholesterol;

aa. pain and mental anguish;

bb. loss of enjoyment of life;

cc. complications of diabetes such as heart disease, kidney disease, diabetic neuropathy, digestive problems, bladder problems, loss of vision, damage to blood vessels, high cholesterol, difficulty in healing sores, amputation of feet and limbs, stroke, and death;

dd. medical attention and care and medical expenses;

ee. loss of earnings and/or earning capacity; and

ff. need for assistance with the activities of daily living, and other financial expenses.

102.     Defendant Janssen's conduct was willful, wanton, and done with intentional or reckless indifference to the rights of Plaintiff and to the public health and safety and the health and safety of Plaintiff and other consumers so as to entitle Plaintiff to an award of punitive damages against Defendant Janssen.

## COUNT IX

## FRAUD

## (JANSSEN)

103.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 and 5 through 10 and Count VIII above as if fully set forth herein.

104.     Defendant Janssen knew or should have known that Risperdal was dangerous and not as effective for its purpose as represented, and posed greater risks than disclosed, and was otherwise not as represented, as previously alleged.

105.     Despite the fact that Defendant Janssen was under a duty to disclose this information to Plaintiff's physician and to Plaintiff, said Defendant Janssen knowingly, and with intent to deceive and defraud consumers, including Plaintiff, made misrepresentations and partial disclosures concerning the nature and quality of Risperdal which Defendant Janssen had a duty to correct because Defendant Janssen was in a superior position to know the true state of the facts about the dangerous and defective nature of Risperdal and its known risks to physicians and Plaintiff.  These deliberate

and/or intentional misrepresentations and omissions of material facts include, but are not limited to:

a.    Stating orally, in product labeling, and in marketing and promotional materials that Risperdal was safe and effective for the treatment of schizophrenia and bipolar mania, which was false and not supported by adequate studies;

b.    Stating orally, in product labeling, and in marketing and promotional materials that Risperdal was safer and more effective for the treatment of schizophrenia and bipolar mania than other available drug products which were less expensive, which was false and not supported by adequate studies;

c.    Advising physicians through sales and marketing personnel that Risperdal was safe and effective for the treatment of conditions and symptoms for which it was not approved and for which there were not adequate studies of safety and efficacy;

d.    Suppressing, failing to disclose and mischaracterizing the known risks of rapid weight gain, hyperglycemia, hyperlipidemia, diabetes mellitus, diabetic ketoacidosis, hyperosmolar coma, death, neuroleptic malignant syndrome, and tardive dyskinesia due to ingestion of Risperdal, which were known to Defendant Janssen through spontaneous reports and studies published in the medical literature;

35

e.     Suppressing, failing to disclose and mischaracterizing the known risks of rapid weight gain, hyperglycemia, hyperlipidemia, diabetes mellitus, diabetic ketoacidosis, hyperosmolar coma, death, neuroleptic malignant syndrome, and tardive dyskinesia due to ingestion of Risperdal, as known to Defendant through spontaneous reports and studies published in the medical literature;

f.     Concealing the fact that Risperdal was required by the responsible Japanese regulatory agency to carry a warning of the risk of hyperglycemia and diabetes and that patients should be monitored for these conditions and the drug stopped if signs or symptoms appeared;

g.     Omitting material information showing that Risperdal was no more effective than other anti-psychotic drugs already available on the market;

h.     Failing to timely and fully disclose the complete and actual results of all clinical tests and studies related to Risperdal;

i.     Failing to disclose that adequate and/or standard and/or generally accepted standards for pre-clinical and clinical testing had not been done;

j.     Downplaying or even denying to practitioners, both orally and in written promotional materials, that Risperdal and other drugs in this class can and do cause rapid weight gain, hyperglycemia,

diabetes, and complications and death therefrom, contrary to information placed in the product labeling at the direction of the FDA;

k.      Failing to advise prescribers and consumers of the need to take a complete medical history prior to prescribing or using Risperdal and to monitor patients for blood sugar levels from labeling and promotional materials;

l.      Failing to disclose that clinical pre-marketing studies were with such limited numbers of patients, in limited populations, for short periods of use of only a few weeks, or with lower doses of Risperdal that Risperdal had not been adequately tested for safety and efficacy in children, the elderly, patients with pre-existing medical conditions, or in conjunction with other medications; and then encouraging use for patients in those populations or, knowing that the drugs were being used in that way, failing to warn practitioners of the risks of doing so;

m.     Failing to disclose that the drop-out rate with patients on Risperdal was among the highest of any antipsychotic medication, an indication of lack of effectiveness or intolerability or both;

n.      Failing to disclose that adequate and/or standard and/or generally accepted standards for post-marketing testing had not been done;

o.    Making these misrepresentations concerning the safety, efficacy and benefits of Risperdal as detailed in this Complaint without full and adequate disclosure of the underlying facts which rendered such statements false and misleading;

p.    Failing to include the aforesaid information in "Dear Doctor" or "Dear Healthcare Provider" letters and other correspondence with practitioners;

q.    Failing to include the aforesaid information in marketing and promotional materials given or shown to practitioners; and

r.    Failing to include the aforesaid information in the product labeling or package inserts;

106.    Neither Plaintiff nor her doctors could not have learned the material facts and important information Defendant Janssen omitted and suppressed. The facts and information suppressed and concealed by Defendant Janssen were material and of such a nature that the suppression and concealment of such facts caused, contributed to, and/or was a substantial factor in the decision of Plaintiff's physician to prescribe, and of Plaintiff to take, Risperdal.

107.    Defendant Janssen knew or should have known that Plaintiff's physician and Plaintiff were relying on Defendant's fraudulent misrepresentations and omissions of material facts.

108.    As a direct and proximate result of Defendant Janssen's fraud, suppression and omission of material facts, Plaintiff acted to Plaintiff's detriment in purchasing and

ingesting Risperdal, which Plaintiff would not have purchased or ingested had Plaintiff been told the truth, and should be reimbursed what Plaintiff spent.

109.    As a direct and proximate result of said acts by Defendant Janssen, Plaintiff has suffered injuries and damages as described herein.

## COUNT X

## STRICT LIABILITY (FAILURE TO WARN)

### (JANSSEN)

110.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 and 5 through 10 and Counts VIII through IX above as if fully set forth herein.

111.    The Risperdal manufactured and/or supplied by Defendant Janssen was and is unaccompanied by proper warnings regarding all known adverse side-effects and the comparative severity and duration of such adverse effects. The warnings given did not and do not accurately reflect the severity or duration of the adverse side effects or the true potential and/or likelihood or rate of the side effects.

112.    Defendant Janssen failed to perform adequate testing which would have shown that Risperdal possessed serious potential side effects with respect to which full and proper warnings accurately and fully reflecting symptoms, scope and severity should have been made with respect to the use of the drugs. Had the testing been adequately performed, Risperdal would have been allowed to enter the market, if at all, only with warnings that would have clearly and completely identified the risks and dangers of the drugs.

113.     As a direct and proximate result of the failure of Defendant Janssen to conduct adequate testing and to furnish an adequate warning to physicians and consumers including Plaintiff and Plaintiff's doctors, the Risperdal manufactured and/or distributed and/or supplied by Defendant Janssen, at the time it left Defendant's hands, was unreasonably dangerous and defective.

114.     Despite this defect, Defendant Janssen continued to aggressively promote Risperdal to physicians and consumers, including Plaintiff.

115.     As a direct and proximate result of the defective condition of Risperdal, as manufactured and/or supplied and/or distributed by Defendant Janssen, Plaintiff has suffered injuries and damages as described herein.

## COUNT XI

## STRICT PRODUCT LIABILITY

## (RESTATEMENT SECOND OF TORTS 402A (1965))

## (JANSSEN)

116.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 and 5 through 10 and Counts VIII through X above as if fully set forth herein.

117.     The Risperdal manufactured and/or distributed and/or supplied by Defendant Janssen was not altered prior to use and was defective in design or formulation in that when it left the hands of Defendant Janssen, the foreseeable risks exceeded the benefits associated with the design or formulation of Risperdal.

40

118.    Alternatively, the Risperdal manufactured and/or distributed and/or supplied by Defendant Janssen was defective in design or formulation in that when said drug product left the hands of said Defendant, it was unreasonably dangerous, was more dangerous than an ordinary consumer would expect, and was more dangerous than other anti-psychotic drugs available at that time.

119.    There existed, at all times material hereto, safer alternative medications.

120.    As a direct and proximate result of the defective condition of Risperdal, Plaintiff has suffered injuries and damages as described herein.

## COUNT XII

## BREACH OF EXPRESS WARRANTY

### (JANSSEN)

121.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 and 5 through 10 and Counts VIII through XI above as if fully set forth herein.

122.    Defendant Janssen expressly warranted that Risperdal was safe and effective for the treatment of schizophrenia and bipolar mania, based on adequate clinical studies.

123.    Defendant Janssen failed to conform to these express representations because Risperdal is not safe or effective and/or possesses a high risk of serious, life-threatening side effects, including those suffered by Plaintiff.

124.    Plaintiff has given reasonable notice to Defendant Janssen of its breach of express and implied warranties.

125.    As a direct and proximate result of said breach of warranty, Plaintiff has suffered injuries and damages as described herein.

## COUNT XIII

## BREACH OF IMPLIED WARRANTY

## (JANSSEN)

126.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 and 5 through 10 and Counts VIII through XII above as if fully set forth herein.

127.    At the time Defendant Janssen marketed, sold, and distributed Risperdal for use by Plaintiff and other consumers, said Defendant knew of the use for which Risperdal was intended and impliedly warranted Risperdal to be of merchantable quality and safe and fit for such use.

128.    Plaintiff and her physician reasonably relied upon the skill and judgment of Defendant Janssen as to whether Risperdal was of merchantable quality and safe and fit for its intended use.

129.    Contrary to such implied warranties, Risperdal was not of merchantable quality or safe or fit for its intended use because Risperdal was and is unreasonably dangerous and unfit for the ordinary purposes for which it was used as described above.

130.    Plaintiff has given reasonable notice to Defendant Janssen of its breach of express and implied warranties.

131.    As a direct and proximate result of said breach of warranty, Plaintiff has suffered injuries and damages as described herein.

## COUNT XIV

## CONCEALMENT, SUPPRESSION, OR OMISSION OF MATERIAL

### FACTS

### (JANSSEN)

132.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 and 5 through 10 and Counts VIII through XIII above as if fully set forth herein.

133.    Defendant Janssen had a post-manufacturing and continuing duty to warn, which arose when they knew, or with reasonable care should have known, that adverse events associated with Risperdal were serious and sometimes fatal.

134.    Defendant Janssen knew or should have known (or would have known had appropriate testing and/or safety monitoring been done) that use of Risperdal caused serious and potentially life-threatening side effects of diabetes.

135.    Defendant Janssen omitted, suppressed, or concealed material facts concerning the dangers and risks associated with the use of Risperdal, including but not limited to the risks of diabetes mellitus and other injuries.  Further, said Defendant purposely downplayed and understated the serious nature of the risks associated with Risperdal use in order to increase the sales of the drug product.

136.    Defendant Janssen falsely and deceptively misrepresented or knowingly omitted, suppressed, or concealed facts of such materiality that Risperdal would never have been approved, no reasonable physician would have prescribed these drugs to Plaintiff, and Plaintiff would not have ingested Risperdal if they had known about the concealed facts.

43

137.    Defendant Janssen engaged in calculated silence, despite their knowledge of the growing public acceptance of misinformation and misrepresentations regarding both the safety and efficacy of the use of Risperdal, and did so because the prospect of significant future profits caused them to ignore concerns regarding health and safety issues, all to the significant detriment of the public, including the Plaintiff.

138.    Safer and less expensive anti-psychotics were available to patients being treated with Risperdal.

139.    Defendant Janssen's actions, as set forth herein, constitute knowing omission, suppression or concealment of material facts, made with the knowledge and intent that doctors and their patients, including Plaintiff, would rely upon such concealment, suppression or omission in connection with the prescribing and use of Risperdal.

140.    In fact, the Plaintiff, directly and/or through Plaintiff's prescribing physician, was induced by Defendant Janssen's omission, suppression and concealment to use Risperdal.

141.    As a direct and proximate result of the conduct of Defendant Janssen as described herein, the Plaintiff has suffered injuries and damages as described herein.

WHEREFORE, Plaintiff Zachary Loes demands judgment in excess of $75,000.00, exclusive of interest and costs, jointly and severally as to all Defendants, for:

(a) Permanent physical injury, including diabetes mellitus, diabetic ketoacidosis, and pancreatitis;

(b) Pain and suffering;

(c)  Mental anguish, emotional distress, loss of enjoyment of life;

(d)  Interest from February 20, 2001;

(e)  Punitive damages against Defendants for their reckless, willful and wanton conduct;

(f)  Attorneys' fees and costs; and

(g)  Such other remedies as this Honorable Court may deem just and appropriate.

Respectfully submitted,

AYLSTOCK WITKIN SASSER PLC

BY:  _Kenneth W. Smith_
Kenneth W. Smith
DC Bar No. 447748
4400 Bayou Blvd., # 58
Pensacola, FL 32503
(850) 916-7450
(850) 916-7449
ksmith@aws-law.com

**ATTORNEY FOR PLAINTIFF**

DATED:        February 23, 2007

## DEMAND FOR JURY TRIAL

Demand is hereby made for a trial by jury.

Respectfully submitted,

AYLSTOCK WITKIN SASSER PLC

BY: *Kenneth W. Smith*

Kenneth W. Smith
DC Bar No. 447748
4400 Bayou Blvd., # 58
Pensacola, FL 32503
(850) 916-7450
(850) 916-7449
ksmith@aws-law.com

**ATTORNEY FOR PLAINTIFF**

DATED:        February 23, 2007

CIVIL COVER SHEET

07 3 400

**I (a) PLAINTIFFS**

Zachary Loes

**DEFENDANTS**

AstraZeneca Pharmaceuticals LP, AstraZeneca LP, Zeneca, Inc., Johnson & Johnson, Janssen, L.P.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   ohomish County,
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   New Castel, DE
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

AYLSTOCK, WITKIN & SASSER, PLC
4400 Bayou blvd., Ste. 58
Pensacola, FL 32503
(703) 778-5978 (Kenneth Smith)

CASE NUMBER   1:07CV00400

JUDGE:  Paul L. Friedman

DECK TYPE:  Personal Injury/Malpractice

DATE STAMP:  02/23/2007

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff
O 3 Federal Question (U.S. Government Not a Party)
O 2 U.S. Government Defendant
⊙ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | ⊙ 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | ⊙ 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

O **A.** *Antitrust*

☐ 410 Antitrust

⊙ **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☒ 365 Product Liability
☐ 368 Asbestos Product Liability

O **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

O **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

O **E.** *General Civil (Other)*   OR   O **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PR ACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** <br> (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** <br> (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** <br> (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** <br> (if Voting Rights Act) |

**V. ORIGIN**

⊙ **1 Original Proceeding**    ○ **2 Removed from State Court**    ○ **3 Remanded from Appellate Court**    ○ **4 Reinstated or Reopened**    ○ **5 Transferred from another district (specify)**    ○ **6 Multi district Litigation**    ○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. 1442 diversity and amount in controversy exceeds $75,000 exclusive of interest and costs; defective drug product

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23    **DEMAND $** in excess of $75,000    Check YES only if demanded in compla...

**JURY DEMAND:**    YES ☒    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE **2/23/07**    SIGNATURE OF ATTORNEY OF RECORD    *Kenneth W. Smith*

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.